**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **AMANDA J. CLARK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 2:10CV10 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Amanda J. Clark for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act, 42 U.S.C. §§ 401 et seq. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 13). Defendant has filed a Brief in Support of the Answer. (Doc. No. 18).

## Procedural History

On August 9, 2005, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on July 28, 2005. (Tr. 12). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated August 14, 2007. (Tr. 27, 53-59, 12-20). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social

Security Administration (SSA), which was denied on December 23, 2009.  (Tr. 8, 4-7).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## **Evidence Before the ALJ**

### A.   **ALJ Hearing**

Plaintiff's administrative hearing was held on June 18, 2007.  (Tr. 376).  Plaintiff was present and was represented by counsel.  (Id.).  The ALJ began by summarizing plaintiff's case. The ALJ stated that plaintiff was applying for disability benefits based on a mental condition and that plaintiff received treatment from a nurse, Carol Greening.  (Tr. 376).  The ALJ noted that plaintiff stopped treatment with Ms. Greening in September 2005.  (Id.).

Plaintiff testified that she moved to North Carolina in September 2005, received treatment in North Carolina, and then resumed treatment with Ms. Greening upon moving back to Hannibal, Missouri in November 2006.  (Tr. 379).  Plaintiff's attorney stated that he had submitted the records from Guilford Medical Center in Greensboro, North Carolina.  (Tr. 380).

Plaintiff's attorney made an opening statement, in which he noted that plaintiff was hospitalized shortly after her alleged onset date and that she has been on a "psychological roller coaster" ever since.  (Tr. 382).  Plaintiff's attorney stated that plaintiff has had GAF[1] scores of 45,

---

[1]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations."  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

40, 50, 30, and 45[2] since she was discharged from the hospital with a GAF score of 76.[3] (Id.).

Plaintiff's attorney stated that, while plaintiff experiences an occasional short period of time during which she feels good, she more often experiences panic attacks and difficulty being around people. (Id.). He stated that plaintiff experiences depression, during which she stays in bed and has many crying spells. (Id.).

Plaintiff's attorney stated that plaintiff sees Ms. Greening for medication refills and counseling. (Tr. 383). Plaintiff's attorney stated that plaintiff was only taking Prozac[4] at the time of the hearing because she was pregnant. (Id.). He explained that Ms. Greening collaborates with Dr. Lyle Clark. (Id.). Plaintiff's attorney noted that the area has a shortage of psychiatrists. (Id.).

Plaintiff's attorney stated that plaintiff has been drug free since September of 2005. (Id.). Plaintiff testified that she had not received any treatment for substance dependence. (Id.).

---

[2]A GAF score of 21 to 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." DSM-IV at 32. A GAF score of 31-40 denotes some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work). Id. A GAF score of 41-50 denotes "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id.

[3]A GAF score of 71 to 80 denotes "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." DSM-IV at 32.

[4]Prozac is a psychotropic drug indicated for the treatment of major depressive disorder. See Physicians' Desk Reference (PDR), 1852-1854 (63rd Ed. 2009).

The ALJ then examined plaintiff, who testified that she was thirty years of age and was a high school graduate. (Tr. 384). Plaintiff stated that she was single, having been divorced. (Id.). Plaintiff testified that she had been married one time for five years, from 1997 through 2002. (Id.).

Plaintiff stated that she was pregnant with her first child at the time of the hearing. (Id.). Plaintiff testified that she had been in a relationship with the child's father for five years. (Tr. 385). Plaintiff stated that her child's father worked as a manual printer and that he printed logos on t-shirts for schools. (Id.). Plaintiff testified that she lives with the father of her child and no one else. (Id.).

Plaintiff stated that the longest job she has had was working at H&B Bank for five years. (Id.). Plaintiff testified that she worked as a teller, a teller supervisor, and then a bookkeeper at H&B Bank. (Id.).

Plaintiff stated that she worked in a hotel as a desk clerk for about two years. (Id.). Plaintiff testified that she checked in customers and managed the front desk at this position. (Tr. 386). Plaintiff stated that this was a full-time position. (Id.).

Plaintiff testified that she worked as a manager of the health and beauty department at Jack's Discount for about three years, from 1995 through 1997. (Id.). Plaintiff stated that when she first started working at Jack's Discount, she operated a cash register and waited on customers. (Id.). Plaintiff testified that she was moved to the returns counter, and eventually became manager of the health and beauty department. (Tr. 387).

Plaintiff stated that when she left Jack's Discount, she started working at Rama, which is a hotel. (Id.). Plaintiff testified that she checked people in and out, made reservations, and

scheduled bus tours at this position. (Id.). Plaintiff stated that she also operated a computer. (Id.).

Plaintiff testified that she next worked at the bank. (Id.). Plaintiff stated that she received her highest income at the bank. (Id.). Plaintiff testified that she worked at the bank until shortly before she was hospitalized. (Id.).

Plaintiff stated that she decided to quit work and apply for disability benefits because she was missing a lot of work due to anxiety and depression. (Id.). Plaintiff testified that her condition deteriorated the last few months she worked at the bank. (Id.). Plaintiff stated that July 2005 was an extremely bad month, during which she was breaking down at work and was unable to complete her duties. (Tr. 388). Plaintiff testified that she was only able to work about two days a week in July 2005. (Id.). Plaintiff stated that she decided that she was no longer able to work. (Id.).

Plaintiff testified that she was under the care of Ms. Greening when she decided to quit her job. (Id.). Plaintiff testified that when she stopped working, her goal was to receive treatment so she could get better and eventually return to work. (Id.). Plaintiff stated that she was living with her boyfriend when she stopped working and that her boyfriend supported her financially. (Id.).

Plaintiff testified that she was hospitalized for five days. (Id.). Plaintiff stated that after she was discharged, she started taking medications that were prescribed by Ms. Greening. (Id.). Plaintiff explained that she took medication prior to her admission but her medications were changed during her hospitalization. (Tr. 389).

Plaintiff testified that she received treatment at Woodland Center in Hannibal, Missouri, until she moved to North Carolina in May of 2006. (Id.). Plaintiff stated that she started

treatment at the Guilford Center when she moved to North Carolina. (<u>Id.</u>). Plaintiff testified that she may have missed an appointment with Ms. Greening in March of 2006. (<u>Id.</u>).

Plaintiff stated that she decided to move to North Carolina to live with her sister in April of 2006 because she thought that new surroundings would help her condition. (Tr. 390). Plaintiff testified that she looked for jobs in North Carolina but was never offered a job. (<u>Id.</u>). Plaintiff stated that her boyfriend found a job at a printing company in North Carolina. (<u>Id.</u>). Plaintiff testified that she and her boyfriend lived with her sister and helped her sister financially by paying for utilities and groceries. (<u>Id.</u>). Plaintiff stated that her sister has two children and that she babysat her sister's children for two days and then decided that she was not able to handle them. (<u>Id.</u>).

Plaintiff testified that she moved back to Hannibal when she found out she was pregnant. (Tr. 391). Plaintiff stated that she became pregnant because her medications made her birth control pill ineffective. (<u>Id.</u>). Plaintiff testified that she wanted to live closer to family for support. (<u>Id.</u>). Plaintiff stated that her baby was due June 30, 2007. (<u>Id.</u>).

Plaintiff testified that she has not worked and has only taken Prozac during the pregnancy. (<u>Id.</u>). Plaintiff stated that stopping her other medications was difficult. (<u>Id.</u>). Plaintiff testified that she stopped the medications because she did not want her baby to be born addicted to medications. (<u>Id.</u>). Plaintiff stated that she would like to go back to work after the baby is born, although she did not know if she would. (<u>Id.</u>). Plaintiff testified that it is very difficult for her to be around people. (<u>Id.</u>).

Plaintiff stated that she started working part-time at a small restaurant in a hotel in February of 2007. (Tr. 392). Plaintiff testified that she bussed tables and seated people at this

position.  (Id.).  Plaintiff stated that she worked fifteen to twenty hours a week.  (Id.).  Plaintiff testified that, after she started working at this position, she and her boyfriend started renting a house on the hotel property.  (Id.).  Plaintiff stated that she just walked across the parking lot to get to work.  (Id.).  Plaintiff testified that her boyfriend also worked at the hotel.  (Id.).  Plaintiff stated that the owner of the hotel sold the hotel and the hotel was closed shortly after she left her position in the beginning of May 2007.  (Id.).  Plaintiff testified that after the hotel closed, her boyfriend started working at a printing shop printing t-shirts.  (Id.).

Plaintiff stated that she quit her job at the hotel due to her anxiety.  (Tr. 393).  Plaintiff testified that after about a month of working, her anxiety worsened and she would vomit every day due to anxiety.  (Id.).  Plaintiff stated that she became so sick that she was unable to go to work.  (Id.).  Plaintiff testified that she quit her job right before the hotel closed.  (Id.).

Plaintiff stated that she missed appointments with Ms. Greening in March 2007 due to morning sickness from her pregnancy.  (Id.).  Plaintiff testified that she was taking 20 milligrams of Prozac but Ms. Greening increased her dosage to 40 milligrams a day in May.  (Tr. 394).  Plaintiff testified that Ms. Greening is also her counselor.  (Id.).

Plaintiff stated that, at the time of the hearing, she and her boyfriend were still living in the house on the hotel property.  (Id.).  Plaintiff testified that she is looking for a place to live and that she has about one month before she has to move out.  (Id.).

Plaintiff stated that she has received Medicaid benefits since becoming pregnant.  (Id.).  Plaintiff testified that she also receives food stamps in the amount of $50.00 a month.  (Id.).

Plaintiff stated that it is hard for her to get out of bed during the day when her boyfriend is working.  (Tr. 395).  Plaintiff testified that she usually stays in bed and watches television.  (Id.).

Plaintiff stated that she takes her dogs outside to go to the bathroom. (Id.). Plaintiff testified that she vacuums the house if she can get up out of bed. (Id.). Plaintiff stated that she does not do anything else. (Id.).

Plaintiff testified that she does not drive unless it is necessary. (Id.). Plaintiff stated that she does not own a car, although her parents are letting her use their vehicle to get to the hospital when the baby comes. (Id.).

Plaintiff testified that she tries to see her family, although she has missed a few holidays and a graduation due to being sick from the pregnancy. (Id.). Plaintiff stated that it is hard for her to be around her family due to her condition. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she last smoked marijuana before she moved to North Carolina in April 2006. (Id.).

Plaintiff stated that she quit her job at the hotel a few weeks before the hotel closed. (Tr. 396). Plaintiff testified that none of the hotel's employees knew the hotel was closing until it was closed. (Id.). Plaintiff stated that employees learned the hotel was closed through signs posted on the door when they came to pick up their checks. (Id.). Plaintiff testified that she earned minimum wage at the hotel position. (Id.).

Plaintiff stated that, since July 15, 2005, she has experienced periods during which she felt better. (Id.). Plaintiff testified that she has felt like she should try to find a job, but then her condition worsened. (Id.).

Plaintiff stated that, when she worked at the hotel, she would become upset in the morning knowing that she had to go in to work that day. (Tr. 397). Plaintiff testified that it would escalate to the point that she was crying and vomiting. (Id.).

Plaintiff testified that she experienced breakdowns at work. (Id.). Plaintiff stated that when she went into work, something came over her where she felt like she was going to explode. (Id.). Plaintiff testified that this would occur approximately two out of the three to four days a week she worked. (Id.). Plaintiff stated that she would go to the bathroom at work and start crying. (Tr. 398). Plaintiff testified that her co-workers were aware of her condition and would send her home if she was unable to compose herself after five minutes. (Id.). Plaintiff stated that she was sent home from work due to these episodes about a fourth of the time she went in to work. (Id.). Plaintiff testified that her employer tolerated this behavior because it was a very small restaurant and they were sympathetic to her issues. (Tr. 399). Plaintiff explained that her position was not vital to the operation of the restaurant. (Id.).

Plaintiff testified that it has been difficult to get out of bed since she stopped taking the Cymbalta[5] and Klonopin.[6] (Id.). Plaintiff stated that she felt better before she became pregnant. (Id.). Plaintiff testified that it has been really difficult to get out of bed and take care of herself since she became pregnant and only takes Prozac. (Id.).

Plaintiff stated that she has talked to Ms. Greening about working. (Id.). Plaintiff testified that Ms. Greening understands that plaintiff has tried unsuccessfully to work and that not being able to work is difficult for plaintiff. (Tr. 400).

The ALJ then examined vocational expert Steven Kuhn. (Id.). The ALJ asked Mr. Kuhn to assume a hypothetical younger worker with a high school education and past work as a bank

---

[5]Cymbalta is indicated for the treatment of major depressive disorder and generalized anxiety disorder. See PDR at 1801.

[6]Klonopin is indicated for the treatment of panic disorder. See PDR at 2639.

teller, clerk, front desk clerk, store manager, and cook, with the following limitations: restricted to unskilled work that is routine and repetitive in nature; no extended concentration or attention; no need to set goals or deal with job changes; and social interaction is brief or superficial, not constant or intense in interpersonal relationships. (Tr. 401). The ALJ noted that the individual would be unable to perform any of plaintiff's past work as plaintiff's past work was all skilled. (<u>Id.</u>). Mr. Kuhn testified that the individual would be unable to perform the full range of unskilled work due to her restriction of limited social interaction with people. (Tr. 402). Mr. Kuhn stated that the individual would be able to perform 75 percent of unskilled work, including the position of production worker, which is light and unskilled (21,000 positions locally, 300,000 nationally); packaging machine operator, which is light and unskilled (10,000 positions locally, 140,000 nationally); and laundry worker, which is light and unskilled (2,500 positions locally, 30,000 nationally). (<u>Id.</u>). Mr. Kuhn testified that the individual would also be capable of performing 75 percent of medium and sedentary positions. (Tr. 403).

The ALJ next asked Mr. Kuhn to assume that the individual had a marked limitation in the ability to interact socially, and remembering how to carry out the job, and an extreme limitation in the ability to deal with work pressures. (<u>Id.</u>). Mr. Kuhn testified that these restrictions would prevent the individual from working in the national economy as work is typically performed. (<u>Id.</u>).

The ALJ then asked Mr. Kuhn whether, based on plaintiff's testimony, he believed plaintiff was capable of performing any type of work. (<u>Id.</u>). Mr. Kuhn testified that he did not believe plaintiff would be capable of performing work on a regular consistent basis. (<u>Id.</u>).

**B.      Relevant Medical Records**

The record reveals that plaintiff saw Lent C. Johnson, M.D. at the Hannibal Clinic from January 2005 through June 2005. (Tr. 116-28). On January 28, 2005, plaintiff complained of difficulty sleeping and difficulty concentrating at work. (Tr. 116). Plaintiff was taking Lexapro[7] and Trazodone[8] as prescribed. (Id.). Upon examination, plaintiff's mood, affect, judgment, and insight all appeared normal. (Id.). Dr. Johnson's impression was depression and insomnia. (Id.). He increased plaintiff's Trazodone and continued the Lexapro. (Id.).

On April 1, 2005, plaintiff reported that she was sleeping better although she was drowsy in the mornings. (Tr. 118). Plaintiff indicated that she was doing better during the day. (Id.). Dr. Johnson's impression was history of underlying depression, improved; and insomnia, improved. (Id.). He increased plaintiff's Lexapro and decreased her Trazodone. (Id.).

On May 6, 2005, plaintiff reported that she felt better and that she was sleeping better. (Tr. 120). Plaintiff indicated that she was doing well at her job and that she did not experience difficulty getting to work on time in the mornings. (Id.). Plaintiff's mood, affect, judgment, and insight appeared normal. (Tr. 123). Dr. Johnson decreased plaintiff's Lexapro. (Id.).

On May 10, 2005, plaintiff complained of tearfulness and crying since the dosage of her Lexapro was decreased. (Tr. 124). Dr. Johnson increased plaintiff's dosage of Lexapro. (Id.).

On June 20, 2005, plaintiff reported feeling much worse and very stressed out. (Tr. 125). Plaintiff indicated that she had been unable to get to work and had been crying a lot. (Id.). Plaintiff's husband was with her and reported that he had multiple medical problems and had been

---

[7]Lexapro is an antidepressant indicated for the treatment of major depressive disorder. See PDR at 1174.

[8]Trazodone is an antidepressant medication indicated for the treatment of depression and mood disorders. See WebMD, http://www.webmd.com/drugs (last visited March 9, 2011).

having difficulty keeping a job.  (Id.).  Plaintiff reported that she had a good job at a bank but her

employer had become less tolerant since she started coming in late all the time.  (Id.).  It was

noted that plaintiff had presented to the emergency room but left because she became frustrated

after being there for four hours.  (Id.).  Upon examination, plaintiff was very anxious and teary-

eyed.  (Id.).  Dr. Johnson's impression was depression with recent exacerbation; and underlying

anxiety.  (Tr. 126).  Dr. Johnson indicated that he would try to obtain a psychiatric consultation in

a timely fashion.  (Tr. 126).  He continued plaintiff's Lexapro, added Alprazolam,[9] and

discontinued the Trazodone.  (Id.).

On June 27, 2005, plaintiff reported that she was doing very well.  (Tr. 127).  She was

taking Alprazolam.  (Id.).  Plaintiff indicated that she still had some trouble getting up in the

mornings but overall was doing better.  (Id.).  Dr. Johnson's impression was anxiety/depression.

(Id.).  He continued her medications.  (Id.).

Plaintiff began seeing Carol Greening, RN, MSN, In collaboration with Dr. Lyle Clark, at

Hannibal Regional Hospital Woodland Center in July 2005.  On July 7, 2005, plaintiff was tearful

and reported that she continues to struggle with sleep.  (Tr. 135).  Plaintiff indicated that she

wakes up in the morning crying and feels out of control.  (Id.).  Plaintiff experienced racing

thoughts, excessive worrying, and vivid dreams.  (Id.).  Upon examination, plaintiff's speech was

clear and goal-oriented and her mood was depressed and anxious.  (Id.).  Plaintiff's affect was

tearful and strained.  (Id.).  Plaintiff's memory, concentration, insight, and judgment were good.

---

[9]Alprazolam is indicated for the treatment of anxiety and panic disorders.  See WebMD,
http://www.webmd.com/drugs (last visited March 9, 2011).

(Id.).  Plaintiff's medications were listed as Klonopin, Cymbalta, and Ambien.[10]  (Id.).  Ms. Greening added Risperdal.[11]  (Id.).  Plaintiff's diagnosis was listed as generalized anxiety disorder.[12]  (Id.).

Plaintiff saw Jennifer L. Scholes, PLPC for counseling on July 7, 2005, upon the referral of Dr. Johnson.  (Tr. 126).  Ms. Scholes noted that plaintiff appeared overwhelmed and upset.  (Id.).  Plaintiff appeared to almost obsess over her negative thoughts so much that she was unable to sleep and was having trouble functioning or even carrying on a conversation without bursting into tears.  (Id.).  Ms. Scholes recommended that plaintiff record her thoughts in a journal.  (Id.).

Plaintiff saw Ms. Greening on July 11, 2005, at which time plaintiff reported that she was sleeping better, although she was still tearful and worried a lot about finances.  (Tr. 137).  Plaintiff's mood was depressed and anxious and her affect was tearful.  (Id.).  Ms. Greening's assessment was slight improvement, but not ready to return to work.  (Id.).  Ms. Greening increased plaintiff's Risperdal.  (Id.).

Plaintiff saw Ms. Scholes on July 14, 2005.  (Tr. 138).  Ms. Scholes noted that plaintiff appeared much more calm, collected, and rational than her last session.  (Tr. 138). Plaintiff believed that the medication was beginning to become effective.  (Id.).

Plaintiff saw Ms. Greening on July 15, 2005, at which time she reported improvement. (Tr. 139).  Plaintiff felt that her mood was less labile since increasing Risperdal.  (Id.).  She was

---

[10]Ambien is indicated for the short-term treatment of insomnia.  See PDR at 2692.

[11]Risperdal is a psychotropic drug indicated for the treatment of schizophrenia.  See PDR at 1754.

[12]A psychological disorder in which anxiety or morbid fear and dread accompanied by autonomic changes are prominent features.  Stedman's Medical Dictionary, 569 (28th Ed. 2006).

sleeping better and denied any side effects from medications.  (Id.).  Ms. Greening's assessment was: improved.  (Id.).  She continued plaintiff's medications.  (Id.).

Plaintiff saw Ms. Scholes on July 19, 2005, at which time she appeared overwhelmed at the idea of returning to work.  (Tr. 140).  Plaintiff cried nearly non-stop throughout the session.  (Id.).  Ms. Scholes gave plaintiff an excuse for work for that day and the next.  (Id.).

Plaintiff saw Ms. Greening on July 20, 2005, at which time she reported that she was struggling with returning to work.  (Tr. 141).  Ms. Greening's assessment was: increased anxiety.  (Id.).  She increased plaintiff's dosage of Klonopin.  (Id.).

Plaintiff saw Ms. Scholes on July 28, 2005.  (Tr. 142).  Plaintiff reported that she reduced her work hours to thirty hours a week.  (Id.).  Ms. Scholes noted that plaintiff was slightly emotional during the session and cried some, but was much more controlled than during her last session.  (Id.).  Plaintiff indicated that she was sleeping better.  (Id.).

Plaintiff saw Ms. Greening on August 3, 2005, at which time she reported that she had been unable to stay a whole day at work.  (Tr. 143).  Plaintiff was tearful throughout her appointment and her mood was anxious.  (Id.).  Ms. Greening's assessment was increased anxiety.  (Id.).  Ms. Greening discontinued the Klonopin and changed to Alprazolam.  (Id.).

On August 11, 2005, plaintiff's mood was upbeat.  (Tr. 144).  Plaintiff reported that she had decided to terminate her employment.  (Id.).  Plaintiff felt as though a weight had been lifted from her shoulders.  (Id.).  Ms. Greening's assessment was: improved.  (Id.).  She discontinued the Risperdal.  (Id.).

Plaintiff saw Ms. Scholes on August 12, 2005, at which time plaintiff appeared relieved at having quit her job.  (Tr. 145).  Ms. Scholes noted that it appeared that the conflict at work was

contributing to much of plaintiff's anxiety.  (Id.).  Plaintiff's mood and outlook were improved

and her thoughts were more rational.  (Id.).

Plaintiff presented to Dr. Lyle A. Clark on August 29, 2005, at which time she reported

experiencing severe depressive symptoms.  (Tr. 148).  Plaintiff complained of episodes of racing

thoughts, rapid speech, jumping subjects, impulsive travel, and feeling on top of the world.  (Id.).

Plaintiff's mood appeared depressed and her affect was appropriate.  (Id.).  Dr. Clark's

assessment was: having significant mood swings.  (Id.).  He started plaintiff on Carbatrol.[13]  (Id.).

Plaintiff was admitted at Hannibal Regional Hospital on September 8, 2005, after

presenting "in crisis."  (Tr. 163).  Plaintiff described symptoms of a major depressive episode, a

hypomanic[14] episode, panic attacks, agoraphobic symptoms, and symptoms consistent with

cannabis dependence.  (Id.).  Plaintiff reported that mood swings occur several times weekly.

(Id.).  Plaintiff admitted that she frequently did not take her medication as directed.  (Id.).  Upon

examination, plaintiff's mood appeared depressed and her affect was appropriate.  (Tr. 165).

Plaintiff's insight and judgment were adequate.  (Id.).  Plaintiff was diagnosed with bipolar II

disorder,[15] depressed; panic disorder[16] with agoraphobia; cannabis dependence, with physiologic

dependence, in a controlled environment; and histrionic personality disorder.[17]  (Tr. 167).  Plaintiff

---

[13]Carbatrol is an anticonvulsant and analgesic indicated for the treatment of epilepsy and
nerve pain.  See PDR at 3019.

[14]A mild degree of mania.  Stedman's at 934.

[15]An affective disorder characterized by the occurrence of alternating hypomanic and
major depressive episodes.  Stedman's at 568.

[16]Recurrent panic attacks that occur unpredictably.  Stedman's at 570.

[17]An enduring and pervasive pattern of behavior in adulthood characterized by excessive,
dramatic, and shallow emotionality; attention-seeking; and demands for approval and reassurance,

was given a GAF score of 41. (Tr. 168). Plaintiff was discharged on September 12, 2005, at which time she was given a GAF score of 76. (Tr. 162). It was noted that plaintiff's condition at the time of discharge was significantly improved and that plaintiff's symptoms were diminished. (Tr. 161). Plaintiff had no side effects and was tolerating the medication well. (Id.). She was looking forward to discharge and had positive future plans. (Id.).

Plaintiff saw Ms. Greening on September 15, 2005, for a follow-up post-hospitalization. (Tr. 151). Plaintiff reported that her hospitalization was helpful and that she was using coping strategies more effectively. (Id.). Ms. Greening's assessment was: improved. (Id.). She continued plaintiff's medications. (Id.).

On October 10, 2005, plaintiff reported that her mood was more stable, she was less anxious, and she was coping more effectively. (Tr. 251). Ms. Greening's assessment was: improved. (Id.).

Paul Stuve, Ph.D., Licensed Psychologist, completed a Psychiatric Review Technique on October 24, 2005. (Tr. 168-81). Dr. Stuve expressed the opinion that plaintiff's impairments were not severe. (Tr. 168).

Plaintiff saw Ms. Greening on November 7, 2005, at which time she reported that her boyfriend lost his job and that she had been more stressed. (Tr. 250). Plaintiff was not sleeping well and was tearful during her appointment. (Id.). Plaintiff indicated that she was anxious about returning to work. (Id.). Ms. Greening's assessment was: increased stress and anxiety. (Id.).

On November 28, 2005, plaintiff reported that her mood was up and down. (Tr. 249).

---

beginning in early childhood and present in a variety of contexts. Stedman's at 569.

Plaintiff complained that the Doxepin[18] was not helping and requested another mood stabilizer. (Id.). Ms. Greening's assessment was: mood instability. (Id.). She discontinued the Doxepin, and started Lamictal.[19] (Id.).

On December 28, 2005, plaintiff reported that she had an opportunity to work part-time but developed a panic attack. (Tr. 248). Ms. Greening's assessment was: fear returning to work. (Id.).

On January 18, 2006, plaintiff remained anxious but reported no panic attacks. (Tr. 247). Plaintiff indicated that she continued to struggle with sleep and experienced mood swings. (Id.). Ms. Greening's assessment was: moderate anxiety and sleep disturbance. (Id.).

On February 16, 2006, plaintiff reported that she had more up days than depressed ones and that she was more anxious in the evening. (Id.). Ms. Greening's assessment was: sleep improved. (Id.).

On April 6, 2006, plaintiff reported that she had decided to move to North Carolina to live with her sister. (Tr. 245). Ms. Greening noted that plaintiff continued to struggle with anxiety and that her depression was stable. (Id.). Ms. Greening's assessment was: anxiety. (Id.). Ms. Greening noted that she would provide medications until plaintiff was established in North Carolina. (Id.).

Plaintiff received mental health treatment at the Guilford Center in Greensboro, North Carolina from May 2006, through December 2006. (Tr. 183-220). On May 17, 2006, plaintiff

---

[18]Doxepin is an antidepressant indicated for the treatment of depression and other mood disorders. See WebMD, http://www.webmd.com/drugs (last visited March 9, 2011).

[19]Lamictal is an antiepileptic drug indicated for the treatment of epilepsy and bipolar disorder. See PDR at 1490.

was diagnosed with bipolar II disorder, depressive disorder, and anxiety disorder, and was assessed a GAF score of 45. (Tr. 213). Plaintiff was prescribed Lamictal, Klonopin, and Cymbalta. (Id.). On July 24, 2006, plaintiff cried throughout her interview and indicated that she was not much better. (Tr. 205). Plaintiff reported that anxiety was her worst problem and is associated with racing thoughts. (Id.). Plaintiff was diagnosed with bipolar II disorder and was assessed a GAF score of 30. (Id.). Plaintiff was prescribed Geodon.[20] (Id.). On August 7, 2006, it was noted that plaintiff was doing well on Geodon. (Tr. 204). Plaintiff was given a GAF score of 50. (Id.). On October 24, 2006, plaintiff reported that she was experiencing increased anxiety with panic attacks. (Tr. 193). Plaintiff was given a GAF score of 40. (Id.).

Plaintiff presented to Ms. Greening on January 4, 2007, at which time she reported that she had recently moved back to the area and that she was four months pregnant. (Tr. 242). Plaintiff had been taking Lamictal, Klonopin, and Cymbalta. (Id.). Plaintiff's mood was slightly anxious. (Id.). Plaintiff indicated that she had moved back to Hannibal to be closer to family for support. (Id.). Plaintiff's medications were discontinued and plaintiff was started on Prozac. (Tr. 241). Plaintiff indicated that she was experiencing a lot of stress and that she did not want to have children and was worried about it. (Id.).

On February 15, 2007, plaintiff reported that an ultrasound revealed she was having a girl and that she was getting used to the idea of becoming a mother. (Tr. 240). Plaintiff had begun to work part-time for the first time in a year-and-a-half. (Id.). Plaintiff was taking Klonopin occasionally. (Id.). Ms. Greening's assessment was: improved-pregnancy going well. (Id.).

---

[20]Geodon is indicated for the treatment of schizophrenia and bipolar mania. See PDR at 2521.

Ms. Greening completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on May 31, 2007. (Tr. 364-65). Ms. Greening expressed the opinion that plaintiff had an extreme limitation in her ability to respond appropriately to work pressures in a usual work setting. (Tr. 365). Ms. Greening found that plaintiff had marked limitations in her ability to understand and remember short, simple instructions; carry out short, simple instructions; understand and remember detailed instructions; carry out detailed instructions; interact appropriately with supervisors; interact appropriately with co-workers; and respond appropriately to changes in a routine work setting. (Tr. 364-65). Ms. Greening expressed the opinion that plaintiff had moderate limitations in her ability to make judgments on simple work-related decisions; and interact appropriately with the public. (Id.). Ms. Greening stated that plaintiff has extreme anxiety and has worked some but is unable to maintain employment. (Id.). Ms. Greening noted that plaintiff has extreme panic attacks, has difficulty in work situations and in public, and suffers from depression. (Tr. 365). Ms. Greening noted that plaintiff has been diagnosed with bipolar II disorder and panic disorder. (Id.).

Plaintiff presented to Jerry Aamoth, M.S., Licensed Psychologist, for a psychological consultation at the request of the state agency. (Tr. 371-73). Plaintiff was highly emotional and cried frequently. (Tr. 371). Mr. Aamoth described plaintiff's mood as moderately to severely depressed. (Id.). Plaintiff reported experiencing mood fluctuations, difficulty concentrating, racing thoughts, and difficulty sleeping. (Id.). Plaintiff reported that she lost her job because she was unable to concentrate and was so depressed that she often could not get out of bed. (Tr. 372). Plaintiff indicated that she began experiencing significant problems with mood swings around April of 2005. (Id.). Mr. Aamoth diagnosed plaintiff with bipolar II disorder, depressed

type; with a current GAF score of 55. (Tr. 372-73). Mr. Aamoth noted that plaintiff experiences regular depression, has trouble getting out of bed, and has lost her self-esteem. (Tr. 373). Mr. Aamoth stated that plaintiff needs intensive counseling and perhaps a reassessment of her medications. (Tr. 373). Mr. Aamoth noted that plaintiff's social functioning has declined. (Id.). Mr. Aamoth expressed the opinion that plaintiff's mental impairment has impacted her ability to work independently and that she should be placed on temporary disability for the next six to twelve months to see if she can avail herself of counseling, as she appears to have a great deal of potential. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.      The claimant has not engaged in substantial gainful activity (SGA) since July 28, 2005, the alleged onset date (20 CFR 404.1520(b). 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: depression and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 4041526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: work must be unskilled (SVP of 1-2), routine and repetitive in nature; work must not require extended concentration or attention; work must not set goals or deal with job changes; and only brief/superficial social interaction with the public and coworkers, with no constant or intense interpersonal social interaction.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May 9, 1977 and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963)

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 28, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-20).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed August 9, 2005, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income protectively filed on August 9, 2005, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 20).

## Discussion

### A. Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

**B.    The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See

20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

C.      **Plaintiff's Claims**

      Plaintiff first argues that the ALJ erred in weighing the opinion of Ms. Greening in determining plaintiff's residual functional capacity.  Plaintiff next argues that the ALJ erred in formulating plaintiff's residual functional capacity.  Plaintiff finally argues that the hypothetical question posed to the vocational expert was deficient.  The undersigned will discuss plaintiff's first two claims.

      Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'"  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Further, determination of residual functional capacity is

"based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: work must be unskilled (SVP of 1-2), routine and repetitive in nature; work must not require extended concentration of attention; work must not set goals or deal with job changes; and only brief/superficial social interaction with the public and co-workers, with no constant or intense interpersonal social interaction.

(Tr. 16-17).

Plaintiff first argues that, in determining plaintiff's residual functional capacity, the ALJ failed to adequately weigh the opinion of Ms. Greening. Specifically, plaintiff contends that the ALJ should have given Ms. Greening's opinion controlling weight. Ms. Greening completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) on May 31, 2007. (Tr. 364-65). Ms. Greening expressed the opinion that plaintiff had an extreme limitation in her ability to respond appropriately to work pressures in a usual work setting. (Tr. 365). Ms. Greening found that plaintiff had marked limitations in her ability to understand and remember short, simple instructions; carry out short, simple instructions; understand and remember detailed instructions; carry out detailed instructions; interact appropriately with supervisors; interact

appropriately with co-workers; and respond appropriately to changes in a routine work setting. (Tr. 364-65). Ms. Greening expressed the opinion that plaintiff had moderate limitations in her ability to make judgments on simple work-related decisions; and interact appropriately with the public. (Id.). Ms. Greening stated that plaintiff has extreme anxiety and has worked some but is unable to maintain employment. (Id.). Ms. Greening noted that plaintiff has extreme panic attacks, has difficulty in work situations and in public, and suffers from depression. (Tr. 365). Ms. Greening noted that plaintiff has been diagnosed with bipolar II disorder and panic disorder. (Id.).

The ALJ stated that he was giving little weight to Ms. Greening's opinions regarding plaintiff's mental limitations because they were not supported by her own treatment records and the record of evidence as a whole. (Tr. 18). The ALJ noted that, when plaintiff was discharged from her hospitalization in September of 2005, her GAF score was 76. (Id.). The ALJ stated that Ms. Greening then consistently noted that plaintiff continued to improve. (Id.). The ALJ noted that, Ms. Greening's treatment notes from two visits indicate that plaintiff's concentration, attention, and insight were all good. (Id.). The ALJ concluded that Ms. Greening's findings are not supported "by the office visits, especially considering that the claimant has reduced her psychotropic medications to just Prozac." (Id.).

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Ms. Greening, a nurse practitioner, is not a treating physician, whose opinions could establish a medically determinable impairment. Under the regulations, evidence from acceptable medical sources is necessary to prove a claimant suffers from a medically determinable impairment. 20 C.F.R. § 416.913(a). A nurse practitioner, however, may be considered another medical source to assist the ALJ in determining the severity of a claimant's impairment. See 20 C.F.R. §§ 404.1513(d), 416.913(d). Under some circumstances, the opinion of a treating nurse may be entitled to greater weight than that of a non-treating consultant. See Shontos v. Barnhart, 328 F.3d 418, 426-27 (8th Cir. 2003) (claimant's therapist and nurse practitioner could be afforded "treating" source status because they were part of a treating team that included an acceptable medical source). In Shontos the Eighth Circuit stated:

> The amount of weight given to a medical opinion is to be governed by a number of factors including the examining relationship, the treatment relationship, consistency, specialization, and other factors. Generally, more weight is given to opinions of sources who have treated a claimant, and to those who are treating sources.

Id. at 426.

The undersigned finds that the ALJ's justification for discounting Ms. Greening's opinion is inadequate and fails to comply with the regulatory requirements. Ms. Greening worked in collaboration with a staff psychiatrist, Dr. Lyle Clark. Ms. Greening was plaintiff's treating

medical source from July 2005 until she moved to North Carolina in May 2006. Plaintiff saw Ms. Greening fourteen times in this ten-month period. Plaintiff resumed treatment with Ms. Greening when she moved back to Missouri in January 2007. As such, Ms. Greening was able to "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

As support for discrediting Ms. Greening's opinion, the ALJ first noted that plaintiff was discharged from her hospitalization in September of 2005 with a GAF score of 76, and that Ms. Greening consistently noted thereafter that plaintiff continued to improve. (Tr. 18). Although plaintiff was given a GAF score of 76 following her hospitalization, Ms. Greening's records did not consistently note improvement. In the two visits following her hospitalization, in September and October of 2005, Ms. Greening noted improvement. (Tr. 151, 251). On November 7, 2005, plaintiff reported that she had been more stressed, was not sleeping well, and was tearful during her appointment. (Tr. 250). Ms. Greening's assessment was increased stress and anxiety. (Id.). On November 28, 2005, Ms. Greening's assessment was mood instability. (Tr. 249). On December 28, 2005, Ms. Greening noted that plaintiff had experienced a panic attack. (Tr. 248). On January 18, 2006, plaintiff complained of mood swings and Ms. Greening's assessment was moderate anxiety and sleep disturbance. (Tr. 247). On February 16, 2006, plaintiff reported that she had more up days than depressed ones, and that she was more anxious in the evening. (Tr. 247). On April 6, 2006, Ms. Greening noted that plaintiff continued to struggle with anxiety. (Tr. 245). The ALJ's finding that Ms. Greening "consistently noted that the claimant continued to improve" is not supported by Ms. Greening's treatment notes. Rather, Ms. Greening's records indicate that plaintiff continued to struggle with anxiety and mood swings.

- 29 -

The ALJ next pointed out that Ms. Greening's treatment notes from two visits indicate that plaintiff's concentration, attention, and insight were all good. (Tr. 18). The fact that plaintiff's concentration, attention, and insight were good during two examinations, however, is not inconsistent with Ms. Greening's findings regarding work-related limitations. In fact, Ms. Greening's records note many instances of reported work-related difficulties.

The ALJ also noted that plaintiff had "reduced her psychotropic medications to just Prozac." (Tr. 18). The record reveals that plaintiff's medication regimen was changed from Cymbalta, Lamictal, and Klonopin to Prozac when plaintiff became pregnant to reduce any potential harm to the fetus. (Tr. 242). The ALJ fails to explain how this change in medication due to plaintiff's pregnancy detracts from Ms. Greening's opinion. Although the ALJ attempts to articulate inconsistencies in Ms. Greening's treatment records, the undersigned finds that Ms. Greening's opinion regarding plaintiff's limitations is supported by her own records.

Ms. Greening's opinion is also supported by the record as a whole. Although the ALJ omits any discussion of treatment notes from the Guilford Center in Greensboro, North Carolina, the record reveals that plaintiff was diagnosed with bipolar II disorder, depressive disorder, and anxiety disorder, and was assessed GAF sores of 30, 40, 45, and 50. (Tr. 183-220). It was noted that plaintiff suffered from anxiety, racing thoughts, and panic attacks. (Id.). The records from the Guilford Center, therefore, are consistent with Ms. Greening's treatment notes and her opinion regarding plaintiff's limitations.

Ms. Greening's findings are also consistent with the opinion of consultative psychologist Jerry Aamoth, the only other examining mental health professional to express an opinion regarding plaintiff's ability to work. (Tr. 371-73). Mr. Aamoth described plaintiff's mood as moderately to severely depressed. (Tr. 371). Mr. Aamoth diagnosed plaintiff with bipolar II

disorder, depressed type; with a current GAF score of 55. (Tr. 372-73). Mr. Aamoth stated that plaintiff needs intensive counseling and perhaps a reassessment of her medications. (Tr. 373). Mr. Aamoth noted that plaintiff's social functioning has declined. (Id.). Mr. Aamoth expressed the opinion that plaintiff's mental impairment has impacted her ability to work independently and that she should be placed on temporary disability to see if she can avail herself of counseling. (Id.).

The ALJ erred in discrediting Ms. Greening's opinion. Ms. Greening, as plaintiff's treating source, was most able to provide a longitudinal picture of plaintiff's mental impairments. Ms. Greening's treatment notes reveal that plaintiff continued to struggle with anxiety and mood swings. She found that plaintiff had significant work-related limitations, which the ALJ did not incorporate into plaintiff's residual functional capacity. Ms. Greening's opinion was consistent with her own records and the record as a whole. Ms. Greening was the only treating source to express an opinion regarding plaintiff's work-related limitations. The ALJ provided no support for his residual functional capacity determination. As such, the ALJ's mental residual functional capacity determination is not supported by substantial evidence.

## Conclusion

In sum, the decision of the ALJ finding plaintiff not disabled is not supported by substantial evidence. The ALJ failed to assign the proper weight to the opinion of Ms. Greening. The ALJ's assessment of plaintiff's residual functional capacity was not based on substantial medical evidence in the record thereby producing an erroneous residual functional capacity. For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to properly evaluate the opinion of plaintiff's treating mental health provider, Ms. Greening;

formulate a new residual functional capacity for plaintiff based on the medical evidence in the record; and then to continue with the next steps of the sequential evaluation process.

Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this ＿23rd＿ day of March, 2011.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE